APPLIED MEDICAL RESOURCES
CORPORATION, Plaintiff,

v.

UNITED STATES SURGICAL
CORPORATION,
Defendant.

No. CV 99–0625 CJC(MLGX).

United States District Court,
C.D. California,
Southern Division.

Nov. 16, 2004.

Bert C. Reiser, David W. Long, William K. West, Jr., Howrey Simon Arnold & White, Washington, DC, Brian C. Horne, Joseph F. Jennings, Joseph R. Re, Karen Vogel Weil, Valerie L. Bracken, Knobbe Martens Olson & Bear, Gregory S. Cordrey, Howrey Simon Arnold & White, Richard J. Grabowski, Thomas R. Malcolm, Jones Day, Irvine, CA, Gregory P. Brummett, Michael A. Conley, Michael R. Dzwonczyk, Scott J. Pivnick, Pillsbury Winthorp, McLean, VA, Karen A. Gibbs, Applied Medical Resources Legal Department, Rancho Santa Margarita, CA, Marvin I. Bartel, Bartel Droste and Gee, Newport Beach, CA, Robert P. Taylor, Howrey Simon Arnold & White, Menlo Park, CA,

Todd G. Friedland, Pillsbury Winthrop, Costa Mesa, CA, for Plaintiff.

Bradford J. Badke, Clark E. Walter, David F. Owens, Harvey Kurzweil, Leo V. Gagion, Lisa B. Deutsch, Dewey Ballantine, James D. Weinberger, Fross Zelnick Lehrman & Zissu, New York, NY, Donald L. Morrow, Paul Hastings Janofsky & Walker, Costa Mesa, CA, Elizabeth W. Walker, Dewey Ballantine, Michael K. Brown, Reed Smith Crosby & Heafey, Los Angeles, CA, Fred H. Bartlit, Jr., Glen E. Summers, Bartlit Beck Herman Palenchar & Scott, Denver, CO, Jill Rochelle Trumbull–Harris, Bartlit Beck Herman Palenchar and Scott, Chicago, IL, Michael J. Coffino, Tatro Coffino Zeavin Bloomgarden, San Francisco, CA, for Defendant.

## ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OF NO WILLFUL INFRINGEMENT PER OCTOBER 1, 2004 MINUTE ORDER

CARNEY, District Judge.

This action came for trial before the Court and a jury, with Honorable Cormac J. Carney presiding. Following the presentation of evidence, the jury was instructed and, on July 28, 2004, the jury rendered its verdict on willfulness and damages. After a hearing on Defendant's Motion for Judgment as a Matter of Law of No Willful Infringement, including the opposition by Plaintiff and oral argument thereon by both parties, and for good cause shown, this Court denied Defendant's Motion by Minute Order dated October 1, 2004. The present Order sets forth in detail the reasons for the Court's denial of the Motion.

## I. BACKGROUND

Plaintiff Applied Medical Resources Corporation ("Applied") is the owner by assignment of U.S. Patent No. 5,385,553, entitled "TROCAR WITH FLOATING SEPTUM SEAL" ("the '553 patent"). A trocar is a medical device used in laparoscopic surgery to provide a passageway through which surgical instruments may be introduced and manipulated within the abdominal cavity. To create a space in which to operate instruments, such as cameras, clip appliers and suturing devices, the abdomen is inflated with gas. The loss of insufflation gas during operation with trocars can be dangerous, because it increases the likelihood that sharp instruments might cause injury. The '553 patent is directed to trocars having seals that can accommodate instruments of varying diameters without the loss of insufflation gas. Applied sued United States Surgical Corporation ("U.S.Surgical") for, *inter alia,* infringing its '553 patent.

This lawsuit is the second lawsuit between the same parties concerning the same patent. Applied first sued U.S. Surgical for infringing the '553 patent (among others) in the United States District Court for the Eastern District of Virginia ("*Applied I* "). On April 29, 1997, a jury found that U.S. Surgical's earlier version of its Versaport trocar infringed, among other things, Claims 4 and 18 of the '553 patent and that such infringement was done willfully. Tr. at 458 (stipulated fact). District Judge T.S. Ellis enhanced the damages awarded by the jury as a result of U.S. Surgical's willful behavior for a total damage award of approximately $20 million, and on May 20, 1997, enjoined further sales of the infringing product. *Applied Med. Resources Corp. v. United States Surgical Corp.,* 967 F.Supp. 861 (E.D.Va. 1997). The U.S. Court of Appeals for the Federal Circuit affirmed that decision. *Applied Med. Resources Corp. v. United States Surgical Corp.,* 147 F.3d 1374 (Fed. Cir.1998), cert. denied, 525 U.S. 1104, 119 S.Ct. 870, 142 L.Ed.2d 772 (1999).

U.S. Surgical began selling its second version of the Versaport immediately after

the *Applied I* injunction became effective. That second version of the Versaport is the infringing trocar at issue here. Applied filed this lawsuit against U.S. Surgical in 1999. On February 26, 2002, this Court determined on summary judgment that U.S. Surgical infringed Claim 3 of the '553 patent by making and selling certain Versaport trocars. On October 15, 2002, this Court entered an order permanently enjoining U.S. Surgical from making, using, offering to sell or selling its infringing Versaport trocars, effective November 1, 2002. On September 11, 2003, the U.S. Court of Appeals for the Federal Circuit affirmed this Court's judgment.

Following a jury trial on willfulness and damages, the jury found on July 28, 2004, that U.S. Surgical's infringement of the '553 patent was willful, and fixed damages in the amount of $43,575,907. On October 1, 2004, the Court denied U.S. Surgical's Motion for Judgment as a Matter of Law of No Willfulness, having conducted oral argument on September 20, 2004.

## II. STANDARD GOVERNING JUDGMENT AS A MATTER OF LAW

■ Judgment as a matter of law ("JMOL") is appropriate only when a party has been fully heard on an issue and there is "no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). To evaluate whether judgment as a matter of law is appropriate, the Court must examine the record in the light most favorable to Applied and draw all inferences in Applied's favor. *See Loral Fairchild Corp. v. Sony Corp.*, 181 F.3d 1313, 1320 (Fed.Cir. 1999). The Court must "disregard all evidence favorable to [U.S. Surgical] that the jury is not required to believe." *Reeves*, 530 U.S. at 151, 120 S.Ct. 2097; *Winarto v.*

*Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir.2001).

■ In ruling on a motion for JMOL, the jury's verdict is not to be disturbed if it is supported by substantial evidence. *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004). Substantial evidence is "such relevant evidence taken from the record as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." *Koito Mfg. Co. v. Turn Key Tech, LLC*, 381 F.3d 1142, 1149 (Fed. Cir.2004). Because JMOL is appropriate where the record is "critically deficient of the minimum quantum of evidence" in support of the verdict, *TI Group Auto. Sys. Inc. v. VDO N. Am., L.L.C.*, 375 F.3d 1126, 1133 (Fed.Cir.2004), U.S. Surgical's burden is "a heavy one." *Comark Communs., Inc. v. Harris Corp.*, 156 F.3d 1182, 1190 (Fed. Cir.1998).

## III. SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S FINDING OF WILLFULNESS

■ A jury's primary task regarding willfulness is to examine the infringer's state of mind and to determine whether it acted in good faith when infringing. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 828 (Fed.Cir.1992) ("Willfulness is a determination as to a state of mind"). The jury must evaluate all the evidence to determine whether the infringer acted in good faith. *Advanced Cardiovascular Sys. v. Medtronic, Inc.*, 265 F.3d 1294, 1308 (Fed. Cir.2001) ("a willfulness finding must be based on all relevant circumstances, also referred to as the totality of the circumstances"). Because a "smoking gun" is rarely available to establish willfulness, juries are often charged with the task of evaluating all the evidence to determine the infringer's state of mind. For that reason, willful infringement is "quintessentially a question of fact." *Biotec Biolo-*

*gische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1356 (Fed.Cir.2001).

■ Based on the jury instructions jointly submitted by the parties, Applied had to "prove by clear and convincing evidence that U.S. Surgical proceeded with its infringing activities without a good faith belief that the patent was either not infringed, invalid, or both." Tr. at 1622–23. In determining whether U.S. Surgical acted in good faith, the jury was instructed to consider "all of the circumstances," including whether or not U.S. Surgical obtained and followed the advice of a competent lawyer. *Id.* In evaluating U.S. Surgical's defense that it relied on the advice of lawyers, the jury was instructed that it may consider, *inter alia,* when U.S. Surgical obtained the advice, the quality of the advice it received, and whether U.S. Surgical relied upon the advice in good faith. *Id.*

Applied presented substantial evidence from which the jury could have concluded that senior management at U.S. Surgical acted with reckless disregard for Applied's patent rights. Specifically, Applied presented evidence showing that 1) U.S. Surgical desperately needed a trocar with a floating seal to satisfy customer demands and remain competitive in the surgical instrument business; 2) U.S. Surgical's management did not properly oversee or adequately participate in development of the second Versaport and placed intense time pressure on their engineers to create a new product; and 3) U.S. Surgical either did not rely upon any opinions of counsel or did not rely on those opinions in good faith.

Based on the totality of the evidence presented at trial, the Court cannot conclude that the jury's willfulness finding was wholly without a rationale evidentiary basis and that sufficient evidence did not support its finding of willful infringement by clear and convincing evidence.

### A. U.S. Surgical Wanted To Have A Trocar With A Floating Universal Seal

### 1. Applied's Floating Seal Technology Was an Essential Feature of the Desirable Universal Seal

Applied presented evidence from which the jury could have concluded that U.S. Surgical needed to offer a trocar with a universal seal to allow the use of multiple sized-instruments. Witnesses uniformly confirmed the importance of a universal seal in the trocar market.[1] For example, Gary Tegan, a former U.S. Surgical marketing executive, testified that a universal seal was important to surgeons and that most disliked adapters. Tr. at 632–34. Applied also presented evidence from which the jury could have concluded that U.S. Surgical needed a universal seal trocar to protect its market share in the face of growing competition. U.S. Surgical attained large profits on the universal seal trocars, with gross profit margins of over 70% (e.g., Ex. 1119 at 09418). Universal seal trocars were critical to realizing profits on other trocars and additional pull-through laparoscopic surgery products sold with the trocars. Tr. at 636. Indeed,

---

1. Tr. at 521–22 and 571–72 (testimony that the universal seal was "absolutely" accepted in the marketplace; that surgeons had "a definite need" for it; that surgeons were "extremely interested" in the technology; and that "they wanted it"); Tr. at 977 (testimony that the universal seal had a lot of advantages compared to an adapter or converter); Tr. at 248–49 (testimony that a universal seal had become the "standard of care" and that the vast majority of surgery centers throughout the United States use universal seals or trocars having universal seals in them).

U.S. Surgical ultimately made gross profits of approximately $310 million on its second Versaport, and $689 million on all trocars throughout the same period. Tr. at 692–96.

Applied presented evidence that its floating-seal technology was essential for the universal seal trocar. U.S. Surgical's own marketing and engineering documents acknowledge that "floatable translation w/o leakage" was "essential," i.e. "critical to performance" of any new design of the Versaport. Ex. 1006 (Customer Product Requirements dated March 23, 1997). U.S. Surgical's primary competitor, Ethicon, even conceded to Applied during negotiations for a license that a universal seal, as provided by Applied's floating seal patent, was a "must" have. Ex. 4 at 9637; Tr. at 434–35. Thus, the jury could rationally infer that U.S. Surgical had to embark on its design efforts with the goal of including at least the benefits of the patented invention.

### 2. U.S. Surgical Continued Selling the Infringing Trocars for Months After This Court's Ruling of Infringement

Applied presented evidence that U.S. Surgical continued selling the infringing trocars even after this Court's summary judgment ruling of infringement on February 26, 2002. U.S. Surgical continued selling its infringing trocars for eight months after that ruling and up until this Court enjoined further sales beginning on November 1, 2002. Tr. at 459; Ex. 2903. In fact, U.S. Surgical made about 20% of its infringing sales after the February 26, 2002 infringement ruling. *See* Ex. 2903 (about 1,624,527 infringing units old after

ruling).[2] From this, a jury could reasonably infer that U.S. Surgical desperately needed a trocar with a floating seal to remain competitive in the marketplace, and that U.S. Surgical was not sufficiently concerned about infringing Applied's patent rights to maintain that competitive edge.

### B. U.S. Surgical's Management Inadequately Prepared to Avoid Infringing the '553 Patent, Despite *Applied I*

Applied presented evidence from which the jury could have concluded that U.S. Surgical did not proceed in good faith in the design, manufacture and sale of its second infringing Versaport trocar. Applied presented evidence that U.S. Surgical was primarily concerned with whether a court could abruptly stop it from making and selling the infringing, but successful, trocars, despite the fact that it had been found to have willfully infringed the '553 patent in *Applied I*. From this, the jury could reasonably infer that U.S. Surgical surrendered to market pressures and recklessly disregarded its affirmative duty of care not to infringe Applied's patent rights.

### 1. U.S. Surgical Began Its Redesign Efforts Only In Response to the Threat of an Injunction In *Applied I*

Applied presented evidence that it took the threat of an injunction for U.S. Surgical to start making any changes to the infringing trocar at issue in *Applied I*. Basam Nabulsi, an in-house patent lawyer at U.S. Surgical, candidly testified that

---

**2.** The post-February 2002 sales are acts of willful infringement in and of themselves. *See, e.g., Bott v. Four Star Corp.,* 807 F.2d 1567, 1573–74 (Fed.Cir.1986) (overruled on other grounds) (infringing sales made after the trial court's decision on liability was willful); *see also Stryker Corp. v. Davol Inc.,* 234 F.3d 1252, 1260 (Fed.Cir.2000) (infringement after verdict but before permanent injunction was willful).

U.S. Surgical initiated the design of the second Versaport in December 1996 only because Applied filed suit in the Eastern District of Virginia, a court which U.S. Surgical knew might conduct trial in a matter of months. Tr. at 1109–12. Mr. Nabulsi even acknowledged that, had Applied sued in a jurisdiction with a slower docket, such as the District of Connecticut where a trial might start years later, U.S. Surgical would not have started a redesign process when it did. Tr. at 1112 ("I think it's unlikely that we would have felt the need to begin a design process in December 1996.").

Applied also presented evidence that in the five months preceding the April 29, 1997 jury verdict in *Applied I,* U.S. Surgical was intentionally designing a trocar having a bellows design, a feature that it knew was specifically claimed in the '553 patent. Tr. at 912–13; 1016–18; *see also* Ex. 13 (Claim 4 of the '553 patent reciting a trocar with a "bellows configuration"); Ex. 2440 (redesigned Versaport included a "bellows"). At trial, Mr. Nabulsi testified that he advised U.S. Surgical that it could make a trocar with a bellows design, merely based on his view that U.S. Surgical would prevail at trial by establishing that a prior art trocar had something that appeared similar to a bellows. Tr. at 1052–58; 1126–28; 1161–65. As a result, during the period of December 1996 through April 29, 1997, U.S. Surgical's belief that it could proceed with a trocar with a bellows design was based on the presumption it would *prevail* on the '553 patent. To the extent any evidence suggests that U.S. Surgical was trying to make a noninfringing design before the *Applied I* jury verdict, a jury could conclude that such an attempt concerned only Applied's two other patents at issue in that case, not the '553 patent. Tr. at 1051–52.

## 2. U.S. Surgical's Engineers Were Not Given Enough Time To Avoid An Infringing Design

Applied presented evidence that on April 29, 1997, when the *Applied I* jury upheld the validity, and found infringement, of the '553 patent, particularly Claim 4, U.S. Surgical knew it had no choice but to abandon the bellows design. Tr. at 912–13; 1016–18; 1060–62. On April 30, 1997, just days after the Virginia jury found in favor of Applied on all issues, (Tr. at 144; 404–405; Ex. 3054), Mr. Nabulsi informed Joe Pasqualucci, U.S. Surgical's Director of Engineering, of the jury verdict, and Mr. Pasqualucci was "angry" (Tr. at 1161) because by that time the trocar design with the bellows was virtually complete. Tr. at 1161–65. On May 1, U.S. Surgical's management told its engineers that they had to eliminate the "bellows" design altogether. Tr. at 912–13; 1016–18; 1161–65; Ex. 3047 at USSC 4653 (Racenet Notebook). U.S. Surgical now concedes that it finalized its new design only eleven days after the engineers were told to eliminate the bellows. USSC Memo. re JMOL of No Willfulness at 12–13 (engineers were told to eliminate the bellows design on May 1 and arrived at a final design by May 13). The jury could rationally find that U.S. Surgical could not have made "significant changes" to the trocar in this short period of time or under such an intense time pressure. Because the jury had all of U.S. Surgical's designs before it, it was free to find that the removal of the bellows in favor of the released "wiper" at issue was an insignificant change as far as broad claims of the '553 patent were concerned.

Applied also presented evidence that U.S. Surgical's removal of the bellows in response to the impending injunction was not a good faith effort to avoid infringement. Rather, U.S. Surgical's manage-

ment was concerned only with contempt of that injunction. U.S. Surgical was determined to make its trocars available by June 2, 1997 (Tr. at 906–907; Ex. 1009). Once the injunction became imminent, however, U.S. Surgical had very little time to change the planned Versaport to both comply with the injunction and make its planned production date. Thus, U.S. Surgical merely modified the outer portions of the floating seal in its second Versaport to remove the bellows to avoid contempt of the injunction on adjudicated Claim 4 of the '553 patent. Compare Ex. 2440 (with bellows) with Ex. 1037 (without bellows); see also Tr. at 1164 ("It was good to go. The only change that needed to be made was the bellows needed to be removed."). U.S. Surgical's witnesses explicitly testified that the company designed its second Versaport to avoid contempt, not infringement. Thomas Bremer, U.S. Surgical's former Senior Vice President and General Counsel, testified that because U.S. Surgical had a "very short time frame" to "get another product out to stay on the market," the contempt proceeding "was primarily the focus of [U.S. Surgical's] efforts in terms of the legal efforts." Tr. at 501–02 ("[t]he immediate issue for me [Mr. Bremer] was the contempt proceeding"). Consistent with this attitude, Mr. Nabulsi testified that U.S. Surgical took comfort in the fact that Applied did not seek contempt, even though he knew avoiding contempt in no way meant U.S. Surgical did not infringe. Tr. at 1174–75.

Additional evidence supports U.S. Surgical's concern with avoiding possible contempt, and not infringement. U.S. Surgical began manufacturing the second Versaport by May, and had begun selling it the first days of June. Tr. at 509–11; USSC Memo. at 14, 16. However, by July, U.S. Surgical had already begun meeting to discuss more substantial redesigns, as shown in Exhibit 4003. Exhibit 4003, written by Mr. Pasqualucci, dis-

cusses major design changes (such as the "ball joint concept" and "turtle-neck") that he thought had to be made. Ex. 4003 ("All are more complex ... This project will not be completed in the same time frame as the prior design as many more aspects of the design must be altered."). Thus, because U.S. Surgical had just introduced its second Versaport, the jury could reasonably find that these meetings showed that U.S. Surgical never actually believed its second Versaport did not infringe the '553 patent, but was designed quickly and simply as a stop gap to dodge any possible contempt motion. See e.g., Tr. at 500 ("when [the contempt proceeding] didn't materialize, we felt that much better ... [t]he fact that nobody sued us, we believed that everything was okay").

Thus, the jury could reasonably find that U.S. Surgical's management acted with a conscious disregard of Applied's patent rights. Moreover, evidence showed they put their engineers under intense time pressure to make the new Versaport trocar. Finally, the jury could have found that U.S. Surgical's management focused on merely avoiding contempt, rather than trying to avoid infringing all of the claims of the '553 patent.

### C. U.S. Surgical Did Not Rely Upon Its Outside Opinions Or At Least Did Not Do So In Good Faith

#### 1. U.S. Surgical's Outside Legal Opinions Were Untimely

At trial, U.S. Surgical produced three written opinions from outside counsel in an attempt to show that it relied on legal advice to make and sell the infringing trocars. Exs. 1088, 1089 and 1090. A jury could reasonably conclude that each of these opinions was obtained too late so that U.S. Surgical could not have relied on them in good faith. The first opinion let-

ter was signed by Mr. Barry Kramer on May 29, 1997. Ex. 1088. Mr. Kramer admitted at trial that his letter was simply "ship[ped] off in the mail" to U.S. Surgical. Tr. at 1337–38. Moreover, after the letter was received, Mr. Bremer asked Mr. Nabulsi to review it and to get back to him. Tr. at 1095–96.

The second and third opinion letters were signed by David Carter on May 30 and June 17, 1997, respectively (Exs. 1090 and 1089). The May 30 letter did not address infringement of the claims of the '553 patent, but was limited to the issue of contempt. Thus, that letter addressed only the two claims adjudicated in *Applied I*, Claims 4 and 18, and whether the Virginia court might find the sale of the second Versaport a contemptuous act. By the time U.S. Surgical received Mr. Carter's June 17 letter, U.S. Surgical had already been selling the second Versaport, having sold numerous units by June 4.

The speed at which U.S. Surgical wanted to introduce its Versaport was apparent. Mr. Bremer testified that U.S. Surgical wanted "no gap" in the supply of Versaport trocars once the *Applied I* injunction took effect on May 20, 1997 (Tr. at 504). Additional testimony revealed that U.S. Surgical began manufacturing its new Versaport trocars in May, 1997 (Tr. at 510), had inventory by June 2, 1997 (Tr. at 1360–61), and had "sold" trocars by June 4, 1997 (Tr. at 510–11). The dates confirm Mr. Bremer's testimony of the pressure he felt because U.S. Surgical only "had a very short time frame" to "get another product out to stay on the market." Tr. at 501–02. Because U.S. Surgical obtained its opinions too close to the date of the first sale of the infringing trocars, a jury could rationally believe that U.S. Surgical had committed itself to proceeding with its infringing activities before receiving any of its outside legal opinions.

### 2. U.S. Surgical Obtained Its Outside Legal Opinions Only as Insurance to Protect Itself in Future Litigation

Applied presented sufficient evidence for the jury to infer that U.S. Surgical sought outside opinions of counsel merely as insurance to protect itself at trial. Mr. Bremer repeatedly confirmed that he sought the opinions for their potential evidentiary value, rather than as legitimate advice upon which he would rely before proceeding to make and sell the second Versaport. His testimony includes such statements as, "I like opinions to be dated prelaunch," (Tr. at 503); "I wanted to be in a position ... to be able to say that before we launched the product, we did our due diligence, we got opinions of counsel and I'm ready to give them up to the court" (Tr. at 507); and "... his attitude [Leon Hirsch], as well as mine was one of we just don't wanted (sic) to have any problems going forward, so let's make sure that we have all the opinions that we need covering whatever issues that may arise regarding this product" (Tr. at 500).

From this evidence, the jury could reasonably find that U.S. Surgical cared less about whether it was infringing Applied's patent rights, and more about whether it could prevail at a future trial with Applied on the issue of willful infringement. *See, e.g., Jurgens v. CBK, Ltd.,* 80 F.3d 1566, 1572 (Fed.Cir.1996) ("the only way the jury could have reached the decision that [the infringer's] conduct was willful was to reject its contention that it relied in good faith on the opinion of counsel"); *Johns Hopkins Univ. v. CellPro,* 978 F.Supp. 184, 194 (D.Del.1997) (that opinions were obtained after decision made to proceed with the infringing activity suggests opinions were wrongly obtained in attempt to "immunize the company from a claim for enhanced damages"), *aff'd,* 152 F.3d 1342,

1365 (Fed.Cir.1998). Therefore, it was not unreasonable for the jury to conclude that U.S. Surgical either did not rely on its legal opinions of outside counsel or did not rely on those legal opinions in good faith.

## IV. CONCLUSION

Applied has presented substantial evidence upon which a reasonable jury could find by clear and convincing evidence that U.S. Surgical's infringement was willful under the totality of the circumstances. Therefore, U.S. Surgical's Motion for JMOL is denied.